IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

```
ROGER JIUNNMING WOO           )
                              )
          Petitioner,         )
                              )
          v.                  )   Civil Action No. 05-1105
                              )
JEFFREY BEARD,                )
et al.,                       )
                              )   Judge Arthur J. Schwab
          Respondents.        )
                              )   Magistrate Judge
                              )   Francis X. Caiazza
```

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

### I. RECOMMENDATION

It is recommended that the Petition for Writ of Habeas Corpus filed by Roger Jiunnming Woo pursuant to the provisions of 28 U.S.C. § 2254 be denied. Also, it is recommended that a Certificate of Appealability be denied.

### II. REPORT

The Petitioner, Roger Jiunnming Woo ("Woo" or "the Petitioner"), is a state prisoner serving a sentence of life imprisonment on a first-degree murder conviction. Presently before this court is his Petition for Writ of Habeas Corpus filed pursuant to 28 U.S.C. § 2254. (Doc. No. 1).

A.   **Relevant Factual and Procedural Background**

On March 27, 1996, a jury empaneled by the Court of Common Pleas of Westmoreland County convicted Woo of first-degree murder in the shooting death of his girlfriend, Sherri Lynn Aukerman. Thomas Ceraso, Esquire, represented Woo during the pre-trial,

trial, and direct appeal proceedings. The Honorable Richard E. McCormick, Jr., presided over the trial.

The evidence admitted at Woo's trial is thoroughly detailed in the state-court decisions contained in the hard-copy record submitted to this court by the Respondents. To briefly summarize, on September 18, 1994, Woo and the victim were target shooting near Route 981 in Derry Township. At around 6:30 p.m., Woo flagged down a passerby, Edward Lechner, and told him that his companion had been shot. Lechner called the police, who soon arrived at the scene. The victim died later that evening as a result of a gunshot wound to the head.

At the scene, Woo explained that the shooting was an accident. Lechner testified at trial that Woo told him that he and the victim were "playing around" with a gun, that she pointed it at her head, and that when he told her not to and grabbed her arm, the gun accidently discharged. Woo recounted a similar explanation to Trooper Leo Jackson and to paramedic Jeff Kuhn. In his defense at his trial, Woo maintained that the shooting was accidental.

Woo's defense was belied, however, by a statement he gave to the police on September 23, 1994. On that date, Woo admitted to an officer: "I pulled the trigger." (Trial Tr. vol. II, 620, Mar. 25, 1996). The officer then took both a written and tape-recorded statement from Woo. State Trooper Brian K. Zimmerman read the following portion of Woo's statement to the jury during the trial:

> [W]e ... went to 3 Mile Hill to [target shoot]. We
> pulled into 3 Mile Hill and got out and took another
> walk. We came back and decided to shoot at the pumpkin
> we had seen earlier. She shot at it first. We looked at
> it and then reset it on the branches. Then I fired, and
> I grazed the bottom of it, and she laughed, calling me
> something to the effect of a bad shot. As she was
> walking towards the pumpkin and I became upset, and I
> fired at her head.... I was scared, obviously, because
> of what I did and put the gun in her hand and pulled
> the trigger. But I can't say for sure that I wanted to
> pull the trigger. I think it went off accidentally.

(Id., 696-97).

To further buttress its position that Woo intentionally shot the victim, the Commonwealth presented the testimony of Trooper Daryl Mayfield, a firearms examiner. He testified that the only way to discharge the gun used in the shooting was to apply at least five and one-half pounds of pressure to the trigger. The Commonwealth also presented evidence to establish that Woo and the victim may have had a troubled relationship. Woo, who was married at the time he met the victim, had left his wife and newborn child a few weeks before the shooting. Witnesses that had seen Woo and the victim the day of the shooting testified that she appeared to be upset.

In the defense's closing argument, Attorney Ceraso maintained that Woo accidentally shot the victim. He explained to the jury that it must be convinced beyond a reasonable doubt of the existence of the corpus delicti of homicide before it could consider Woo's inculpatory statement to police.[1] He argued that

_____

[1]   Pennsylvania's corpus delicti rule "places the burden upon the prosecution to establish that a crime has actually occurred before a confession or admission of the accused connecting him to

the Commonwealth failed to meet that burden. Additionally, Attorney Ceraso maintained that, if the jury determined that the Commonwealth had established beyond a reasonable doubt the *corpus delicti*, it should discount Woo's statement to the police because it was not voluntary, but rather the product of extensive and coercive police interrogation.

The jury found Woo guilty of first-degree murder. Judge McCormick sentenced him to the mandatory term of life imprisonment. Woo, through Attorney Ceraso, appealed his judgment of sentence to the Superior Court of Pennsylvania. The Superior Court affirmed on April 22, 1997. The Supreme Court of Pennsylvania denied a subsequent petition for allowance of appeal. Thereafter, Woo retained Attorney Robert L. Stewart, Esquire, to represent him. The United States Supreme Court denied his petition for writ of certiorari on May 18, 1998.

Next, Woo, through Attorney Stewart, filed a petition for post-conviction relief pursuant to the Pennsylvania Post-Conviction Relief Act (the "PCRA"). He claimed, *inter alia*, that he received ineffective assistance of counsel because Attorney Ceraso failed to investigate and present a diminished-capacity defense.

**1.   Pennsylvania's Diminished Capacity Defense**

Diminished capacity is an extremely limited defense under Pennsylvania law. See Commonwealth v. Taylor, 876 A.2d 916, 926

---

the crime can be admitted." Commonwealth v. Verticelli, 706 A.2d 820, 822 (Pa. 1998) (citations omitted).

(Pa. 2005); Commonwealth v. Legg, 711 A.2d 430, 444 (Pa. 1998); Commonwealth v. Terry, 521 A.2d 398, 404-09 (Pa. 1987); Commonwealth v. Zettlemoyer, 454 A.2d 937, 943 (Pa. 1982); Commonwealth v. Weinstein, 451 A.2d 1344, 1347 (Pa. 1982). A defendant invoking the defense concedes general criminal liability but contends that the prosecution is unable to prove specific intent, an essential element of first-degree murder. Id.; see also Zettlemoyer v. Fulcomer, 923 F.3d 284, 295-96 (3d Cir. 1991). To support the defense, a defendant must proffer admissible evidence that he suffered from a mental illness that affected his cognitive functions to an extent that precluded deliberation and premeditation. See e.g. id.; Commonwealth v. McCullum, 738 A.2d 1007, 1009 (Pa. 1999); Terry, 521 A.2d at 404.

The diminished capacity defense was first recognized by the Pennsylvania Supreme Court in Commonwealth v. Walzack, 360 A.2d 914 (Pa. 1976). In that case, the defendant conceded that he had committed the killing but attempted to offer into evidence testimony from a psychiatric expert to establish that, due to a previous brain surgery (a frontal lobotomy), he did not possess the mental capacity to form the specific intent to kill. The trial court refused to permit the expert to testify, and the defendant was convicted of first-degree murder and sentenced to life imprisonment. On appeal, the Pennsylvania Supreme Court concluded that the defense of diminished capacity was cognizable in Pennsylvania. It also reversed the trial court's decision to

exclude the proffered psychiatric evidence, holding that expert evidence that is relevant to a defendant's ability to formulate the specific intent to kill is admissible. Id. at 918-19.

Prior to the decision of the Pennsylvania Supreme Court in Walzack, state law had precluded the use of expert psychiatric testimony on the issue of a defendant's *mens rea* because of doubt as to the reliability of such testimony. Terry, 521 A.2d at 404 (citations omitted); Walzack, 360 A.2d at 918. In Walzack, however, the Pennsylvania Supreme Court recognized the "tremendous advancements made in the field" of psychiatry and concluded that such testimony could be admissible to support a diminished capacity defense. 360 A.2d at 918-20.

The Pennsylvania Supreme Court subsequently has made clear, however, that Walzack:

> did not make all expert psychiatric testimony on the
> issues of sanity, malice, specific and general intent
> admissible or relevant. . . . Such testimony must be
> definite and specific and address a recognized defense
> under Pennsylvania substantive law. Nor did [Walzack
> and its progeny] change the rule that expert testimony
> offered to prove a medico-legal fact, such as
> causation, is incompetent and inadmissible unless it
> speaks to more than a mere possibility.

Terry, 521 A.2d at 404 (emphasis in original) (citing Zettlemoyer, 454 A.2d at 943; Weinstein, 451 A.2d at 1347); see also Taylor, 876 A.2d at 926-27; McCullum, 738 A.2d at 1009-10.

Accordingly, before a defendant may introduce expert mental health evidence at trial to support a diminished capacity defense, he must establish that the evidence is relevant and

probative on the issue of specific intent. Id. (and cases cited therein); see McCullum, 738 A.2d at 595-96. Only expert mental health testimony that "speaks to mental disorders affecting the cognitive functions necessary to formulate a specific intent" is relevant and admissible. Id. (quoting Weinstein, 451 A.2d at 1347); Legg, 711 A.2d at 444-45. Moreover, conclusory expert testimony on an ultimate fact, such as the non-existence of specific intent, is improper under Pennsylvania law if the testimony is unsupported by the expert's underlying testimony. Id. at 403 n.9, 406; Zettlemoyer, 454 A.2d 943-47.

Where the proffered expert mental health evidence does not speak to those mental disorders that affect cognitive functions, the evidence "is irrelevant and hence inadmissible." Id. (quoting Weinstein, 451 A.2d at 1347). The Pennsylvania Supreme Court has "repeatedly rejected the contention that evidence of a defendant's supposed inability to control his actions – by virtue of an 'irresistible impulse,' a 'compulsion,' or otherwise – is relevant to negate specific intent, and [the court has] consistently held that such evidence may not be admitted in support of a diminished capacity defense." Taylor, 876 A.2d at 926-27 (collecting cases); Zettlemoyer, 454 A.2d at 949 ("[N]either social maladjustment, nor lack of self-control, nor impulsiveness, nor psycho-neurosis, nor emotional instability, . . . nor all such conditions combined bear upon the narrow defense of diminished capacity.")

   **2.   The Evidence Admitted At the PCRA Hearings**

Judge McCormick presided over three evidentiary hearings on the PCRA petition. James Woo, the Petitioner's father, testified that when his son was age nine his mother committed suicide. The Petitioner discovered her body hanging from a metal pipe in the basement. James Woo stated that he informed Attorney Ceraso of these circumstances. He also explained that, after his wife's suicide, he did not seek mental health care for his son because, in the Chinese culture in which he was raised, it was considered shameful to be in need of psychiatric treatment.

Attorney Ceraso testified that his legal practice has centered upon criminal defense work for approximately thirty years and that Woo's trial was the twenty-third homicide case that he had defended. He explained that he did not present a diminished capacity defense at trial because there was no indication to him, through his investigation of the circumstances of the case and in his discussions with either Woo or his father, that such a defense was warranted.[2]

---

[2]  Attorney Ceraso testified that he was not aware that Woo's mother had committed suicide and that he had discovered his mother's body. Counsel maintained that neither Woo nor his father had shared that information with him. (PCRA Tr., 10-13, Dec. 15, 2000). When asked why he did not have Woo examined by a psychiatrist prior to trial, Attorney Ceraso responded:

> I don't try to make up defenses, and I'm not trying to be smart when I say that. But it's always been my position that you investigate, you conduct interviews, you conduct your trial within the scope of knowledge that you have. And I've had this issue come up before. Do you take everybody that has a homicide case and send them to a psychiatrist? At least, it's my position that that's not proper, that if you're – you're begging a defense by doing that, if, in fact, you don't have a

Finally, Woo presented the expert testimony of two forensic psychiatrists, Gary M. Glass, M.D. and Qi Hu, M.D., each of whom had examined him for the PCRA proceedings.[3] (See PCRA Tr., 33-106, Dec. 15, 2000). Dr. Glass prepared a written report, which was admitted into evidence. (See PCRA Ex. A). In his report and at the hearing, Dr. Glass noted Woo's manic behavior, including spending sprees, sexual escapades in public, obsessive compulsive behavior, periods of little sleep, high energy, sexual activity, and moderate and severe depression. He diagnosed Woo with post traumatic stress disorder (caused by his mother's suicide), bi-polar disorder type II (which he described as being "similar [to] mood swings"), polysubstance abuse (alcohol), and borderline personality disorder. (PCRA Tr., 46-58, Dec. 15, 2000). He concluded that Woo suffered from a mental defect or disorder that affected the cognitive functions of deliberation and premeditation such that he was unable to rationally formulate the specific intent to kill. (Id., 67; PCRA Ex. A at 10).

Dr. Hu's diagnoses was similar but not identical to Dr. Glass's diagnoses. Dr. Hu, an expert in Asian-American mental-health issues, diagnosed Woo with major depressive

_____

factual basis for asserting or at least exploring that
defense, and that's why I didn't do it in this
instance, and wouldn't do it.

(Id., 15).

[3]  Dr. Glass's and Dr. Hu's reports, which were admitted as PCRA
EX. A and PCRA Ex. B respectively, are contained in the state-
court record attached to Woo's Petition for Post Conviction
Collateral Relief (located at item number 49 in the record).

disorder, delusional disorder, post traumatic stress disorder, and intermittent explosive disorder. (PCRA Ex. B at 6-7). He further noted Woo's history of alcohol abuse. He explained the stigma that mental-health illness has in Chinese culture, and remarked that it was not surprising that Woo did not receive counseling after his mother's suicide or that neither Woo nor his father acknowledged prior to and during the criminal trial that members of the Woo family had suffered from mental illness. (PCRA Tr., 87-88, Dec. 15, 2000). Dr. Hu opined that Woo "was incapable of any premeditated homicidal plan," and there was "no evidence that Mr. Woo had the capacity for a premeditated homicidal plan as a result of his severe and unstable psychological condition." (PCRA Ex. B at 8).

The Commonwealth presented the testimony of Martin Jerome Fialkov, M.D. (See PCRA Tr., 4-45, Aug. 22, 2002). Dr. Fialkov stated that he found no evidence that at the time of the shooting that Woo suffered from post traumatic stress disorder or that he was symptomatic of bi-polar disorder. (Id., 10-25, 42-43). He further stated: "The only disease that I could elicit from him was an adjustment disorder with mixed anxiety and depressed mood[.]" (Id., 21). He concluded that Woo did not suffer from any mental defect or disorder at the time of the shooting that affected his ability to form the specific intent to kill. (Id., 25).

### 3.  The State Court Decision

Judge McCormick denied Woo's PCRA petition in an opinion and

order dated April 7, 2003. (<u>Commonwealth v. Woo</u>, No. 3290 C 1994,
slip op. (C.P. Westmoreland Co. Apr. 7, 2003)).[4] He noted that to
prove ineffective assistance of counsel, Woo had to show that:
(i) his underlying claim (that he had a viable diminished
capacity defense available to him at trial) had merit;
(ii) Attorney Ceraso had no reasonable basis for not
investigating and presenting that defense; and (iii) he was
prejudiced by Attorney Ceraso's failure to pursue the defense.
(<u>Id.</u> at 1 (citing <u>Commonwealth v. Pierce</u>, 527 A.2d 973, 975 (Pa.
1987)). Judge McCormick then held that Woo's claim failed because
he did not establish the first prong of the above-cited analysis:
that he had a viable diminished capacity defense available to him
at trial.

    In reaching his holding, Judge McCormick determined that
neither of Woo's experts offered relevant psychiatric testimony
that would have been admissible at trial to support a diminished
capacity defense. Undergirding that decision was his factual
finding that neither doctor was able to directly relate Woo's
mental defects to a purported inability to formulate a specific
intent to kill. He explained:

> [N]either expert was able to articulate that [the
> Petitioner's] particular disorders or diagnoses
> affected the cognitive functioning of the Petitioner
> and his ability to form specific intent to commit the
> crime of homicide. Neither doctor analyzed the detailed
> facts and circumstances presented by the Petitioner
> himself concerning his state of mind on the day of the

---

[4]  This opinion is contained in the hard copy of the state court
record and is identified therein as item number 113.

killing to explain why these facts were consistent with
a lack of cognition.

(<u>Id.</u> at 7).

Woo appealed Judge McCormick's decision through new counsel,
Caroline M. Roberto, Esq. The Superior Court of Pennsylvania
affirmed in an opinion and order dated September 2, 2004.
(<u>Commonwealth v. Woo</u>, No. 895 WDA 2003, slip op. (Pa.Super.Ct.
Sept. 2, 2004)).[5] The court reiterated that diminished capacity
"is an extremely limited defense and that psychiatric testimony
that addresses mental disorders affecting the cognitive functions
of deliberation and premeditation necessary to formulate a
specific intent is admissible. However, psychiatric evidence that
a defendant lacked ability to control his actions or that he
acted impulsively is irrelevant and inadmissible on the issue of
the defendant's specific intent to kill." (<u>Id.</u> at 2-3 (quoting
<u>Legg</u>, 711 A.2d at 433)).

The Superior Court held that it found no reason to disagree
with Judge McCormick's factual determinations. (<u>Id.</u> at 4-6). It
agreed with Judge McCormick's finding that neither Dr. Glass nor
Dr. Hu established the required nexus between his underlying
diagnoses and his ultimate conclusion that Woo lacked specific
intent to kill. <u>Id.</u> Thus, Woo failed to establish that, if
Attorney Ceraso had investigated, the defense would have had
admissible evidence available to support a claim of diminished

---

[5]  This opinion is contained in the hard copy of the state court
record and is identified therein as item number 126.

12

capacity. Accordingly, the Superior Court held that Woo did not demonstrate that Attorney Ceraso provided him with ineffective assistance of counsel for failing to investigate and present that defense.

The Supreme Court of Pennsylvania denied Woo's subsequent petition for allowance of appeal. Woo then filed in this court, through Attorney Roberto, a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. (Doc. No. 1). Therein, he contends that he is entitled to a new trial because Attorney Ceraso provided him with ineffective assistance of counsel for failing to investigate and present a diminished capacity defense at trial.

**B.   Legal Analysis**

    **1.   Standard of Review**

Because the state courts adjudicated Woo's claim on the merits, this court must review the claim under the deferential standard set forth in the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") (codified at 28 U.S.C. § 2254(d)). AEDPA "modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." Bell v. Cone, 535 U.S. 685, 693 (2002).

Under AEDPA, federal habeas relief may only be granted when the state court's decision on the merits of a claim "resulted in

a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States[.]" 28 U.S.C. § 2254(d)(1); see also Williams v. Taylor, 529 U.S. 362, 405-06 (2000); Lambert v. Blackwell, 387 F.3d 210, 234 (3d Cir. 2004). This determination requires a two-step analysis. See e.g., Hackett v. Price, 381 F.3d 281, 287 (3d Cir. 2004); Werts v. Vaughn, 228 F.3d 178, 197 (3d Cir. 2000). First, the court must identify the applicable Supreme Court precedent and determine whether the state court's adjudication of the claim is "contrary to" it.[6] Id. If it is not, then the court must determine whether the state court's adjudication was an "unreasonable application" of that law.[7] Id.

State court factual determinations are also given considerable deference under AEDPA (and indeed were accorded such

---

[6]   "A state-court decision is 'contrary to' clearly established federal law if the state court (1) 'contradicts the governing law set forth in [the Supreme] Court's cases' or (2) 'confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a [different] result.'" Lambert, 387 A.2d at 234 (quoting Williams, 529 U.S. at 405-06).

[7]   "A state-court decision 'involve[s] an unreasonable application' of clearly established federal law if the state court (1) 'identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular . . . case'; or (2) 'unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply.'" Lambert, 387 A.2d at 234 (quoting Williams, 529 U.S. at 407).

deference even before the enactment of that statute). <u>Lambert</u>, 387 F.3d at 239. Woo must establish that the state courts' adjudication of his claim "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d)(2). Within this overarching standard, he may attack specific factual determinations that are subsidiary to the ultimate decision. <u>See</u> 28 U.S.C. § 2254(e)(1); <u>Lambert</u>, 387 F.3d at 235. Section 2254(e)(1) instructs that "a determination of a factual issue made by a State court shall be presumed to be correct. The [petitioner] shall have the burden of rebutting the presumption of correctness by clear and convincing evidence."[8]

---

[8]  As an analytical matter, the interplay between § 2254(d)(2) and § 2254(e)(1) is not entirely clear. The United States Supreme Court has yet to specifically examine the relationship of these two sections. <u>See</u> <u>Rice v. Collins</u>, – U.S. – , 126 S.Ct. 969 (2006). The Courts of Appeals have adopted various approaches. <u>Lambert</u>, 387 F.3d at 235-36. Under the Court of Appeals for the Third Circuit's approach:

> [A] federal court may wish to consider subsidiary challenges to individual fact-finding in the first instance applying the presumption of correctness as instructed by (e)(1). Then after deciding these challenges, the court will view the record under (d)(2) in light of its subsidiary decisions on the individual challenges. In other instances, a federal court could conclude that even if [the] petitioner prevailed on all of his individual factual challenges notwithstanding the (e)(1) presumption of their correctness, the remaining record might still uphold the state court's decision under the overarching standard of (d)(2). In that event, presumably the (d)(2) inquiry would come first.
>    Whatever the order of inquiry, however, two points are paramount. First, both (d)(2) and (e)(1) express the same fundamental principle of deference to state court findings. Second, before the writ can be granted,

Id.

### 2.    Clearly Established Federal Law: Strickland v. Washington

The "clearly established Federal law" in which to analyze Woo's claim of ineffective assistance of counsel is set forth in Strickland v. Washington, 466 U.S. 668 (1984). In Strickland, the Supreme Court held that in order to establish that counsel's service was constitutionally deficient, a petitioner must demonstrate: (1) that counsel's performance fell below an objective standard of reasonableness; and (2) that the deficient performance prejudiced the defense. See also Wiggins v. Smith, 539 U.S. 510 (2003).

Although Pennsylvania courts articulate a three-prong test for gauging ineffective assistance claims and Strickland sets forth its test in two prongs, the legal evaluation is the same, and the differences merely reflect a stylistic choice on the part of state courts. Rompilla v. Horn, 355 F.3d 233, 248-49 (3d Cir. 2004) rev'd on other grounds, Rompilla v. Beard, 545 U.S. 374 (2005); see also Werts, 228 F.3d at 202-03 (examining Pennsylvania ineffective assistance law and determining that it is identical to the Strickland standard). The first prong of the Pennsylvania formulation – whether the underlying claim has arguable merit – is a factor that may be considered under

petitioner must show an unreasonable determination – under (d)(2) – in light of the entire record in the original state court trial.

Id. at 236 n.19.

16

Strickland's first prong. Rompilla, 355 F.3d at 248 n.9 (citing Parrish v. Fulcomer, 150 F.3d 326, 328 (3d Cir. 1998) (counsel not ineffective for failing to raise meritless claims); see also Strickland, 488 U.S. at 691 (the failure to pursue "fruitless" claims "may not be challenged as unreasonable.") Of course, the merit of the underlying claim is also a consideration in Strickland's prejudice prong because, in an example relevant to this case, a petitioner cannot show that his counsel's failure to pursue a defense at trial prejudiced him if that defense was not available to the petitioner.

### 3.  The State Courts' Decision Was Not "Contrary To" Strickland

The state courts' adjudication of Woo's ineffective assistance claim was not "contrary to" Strickland. The state courts applied the correct legal standard to the claim, and that is sufficient to satisfy review under the "contrary to" clause of § 2254(d)(1). Woo admits that "[i]n practice and in law, the two-prong Strickland standard and the three-prong Pennsylvania standard are, essentially, the same standard."[9] (Doc. No. 1 at 8

---

[9]  Woo acknowledges that the state and federal analysis of ineffective assistance of counsel claims are the same, however he faults the state courts for failing to cite to Strickland and contends that the Superior Court "ignored" his federal claim. There is no merit to these arguments. Although the state courts did not cite to Strickland, they cited to state precedent (or the progeny of state precedent), that relies on Strickland. Accordingly, the state courts adjudicated Woo's federal claim on the merits but simply chose to address the claim within the framework of its own three-part test. See Rompilla, 355 F.3d at 248. (And, the Supreme Court has made clear that citation to or even awareness of its precedent is unnecessary as long as neither the reasoning nor the result of the state court decision

n.1). As the <u>Williams</u> Court instructed, "a run-of-the mill state-court decision applying the correct legal rule from [Supreme Court] cases [does] not fit comfortably within § 2254(d)(1)'s 'contrary to' clause." 529 U.S. at 406; <u>Rompilla</u>, 355 F.3d at 202-24 ("[A] state court decision that applied the Pennsylvania [ineffective assistance of counsel] test did not apply a rule of law that contradicted <u>Strickland</u> and thus was not 'contrary to' established Supreme Court precedent.")

### 4. The State Courts' Decision Was Not an "Unreasonable Application Of" <u>Strickland</u>

The dispositive question, then, is whether the state courts' adjudication of Woo's ineffective assistance of counsel claim was an "unreasonable application" of <u>Strickland</u>. In making this determination, "we are not authorized to grant habeas corpus relief simply because we disagree with the state court's decision or because we would have reached a different result if left to our own devices." <u>Werts</u>, 228 F.3d at 197. Instead, "the state court's application of [<u>Strickland</u>] must have been objectively unreasonable," meaning, the "outcome . . . cannot reasonably be justified under existing Supreme Court precedent." <u>Hackett</u>, 381 F.3d at 287.

Central to this court's inquiry is the state courts' determination that the expert mental-health evidence Woo presented at the PCRA proceedings would not have been admissible at trial to support a diminished capacity defense. Importantly,

---

contradicts it. <u>Early v. Packer</u>, 537 U.S. 3 (2002)).

the determination of whether Dr. Glass's and Dr. Hu's testimony would have been admissible is one of state law, which is not reviewable by this court. <u>Preister v. Vaughn</u>, 382 F.3d 394, 402 (3d Cir. 2004) ("Federal courts reviewing habeas claims cannot 'reexamine state court determinations on state-law questions.'") (quoting <u>Estelle v. McGuire</u>, 502 U.S. 62, 67-68 (1991)). For that reason alone, Woo's claim fails.

Additionally, the state courts' decision is based upon a factual determination made by Judge McCormick and affirmed by the Superior Court: that neither expert provided a sufficient nexus between Woo's mental illnesses and the conclusion that Woo lacked the specific intent to kill. Under AEDPA, this court must presume that factual determination is correct. To overcome that presumption, Woo must direct this court to "clear and convincing evidence" that the state courts were wrong, 28 U.S.C. § 2254(e)(1), and that their decision was "unreasonable," <u>id.</u> § 2254(d)(2). He has not done so in this case.

Woo contends that the state courts' determination was "factually mistaken" and "crabbed and indefensible." However, a review of the record demonstrates that there was ample support in the record from which the state courts could conclude that neither Dr. Glass nor Dr. Hu articulated a convincing nexus between Woo's mental illnesses and his purported lack of specific intent to kill. Therefore, this court may not disturb the state courts' determination. 28 U.S.C. § 2254(d)(2), (e)(1).

Initially, it must be noted that Dr. Glass's and Dr. Hu's

19

opinion on the ultimate issue – whether Woo lacked the specific intent to kill – would only be admissible at trial if that opinion was supported by his underlying report and testimony. Terry, 521 A.2d at 403 n.9, 406-08; Zettlemoyer, 454 A.2d at 943-47. That is why the state courts focused on whether Woo established a relation between each doctor's ultimate opinion and the underlying findings that purportedly supported it

A review of Dr. Glass's report immediately reveals why the state courts held that the doctor's testimony would have been inadmissible if Woo had attempted to offer it at his trial. Although Dr. Glass diagnosed Woo with several disorders, he stated that Woo's "*cognitive functions are fine[.]*" (PCRA Ex. A at 7). That finding is fatal to Woo's contention that the doctor's testimony supports a diminished capacity defense because "psychiatric testimony is *irrelevant* . . . unless 'it speaks to mental disorders affecting the *cognitive functions* of [deliberation and premeditation] necessary to formulate a specific intent." Zettlemoyer, 454 A.2d at 943 (emphasis added) (quoting Walzack, 451 A.2d at 1347).

At the hearing, Judge McCormick asked Dr. Glass about his conclusion that Woo's cognitive functions were fine. In response, Dr. Glass admitted that although post traumatic stress disorder can affect cognition, "I don't think it did here." (PCRA Tr., 74, Dec. 15, 2000). Because of Dr. Glass's statement regarding Woo's cognitive functions, it was certainly reasonable for the state courts to find as fact that the doctor failed to relate Woo's

20

underlying mental defects to the cognitive functions of premeditation and deliberation.

In the only portion of his report in which Dr. Glass specifically details why he determined that Woo lacked the specific intent to kill, he states:

> Certainly if [Woo] intended to murder Sherri he would have taken more care and been more cautious. Instead, this young man who has been very calculating in other areas of his life, shoots Sherri near enough to others to have heard the shots. He does not try and hide, he does not try and flee. He calls 911 and awaits their arrival. He is not held as a suspect but brings attention to himself by contacting the police regarding the guns. He is offered, and voluntarily submits to a polygraph tests without even seeking counsel or without even a second thought. He waves his rights to representation and gives varying statements to authorities.

(PCRA Ex. A at 9). Nothing in the above-cited paragraph provides insight into the connection between Woo's mental disorders and his cognitive functions. Indeed, it harkens back to a comment that Dr. Glass made earlier in his report that reflects a weakness in his analysis: that Woo's behavior the day of the killing "do[es] not make sense." (Id. at 7). An individual's action not making sense, however, is far from relevant and admissible testimony on the issue of whether that individual possessed the *mens rea* necessary to specifically intend to kill.

At the hearing, Dr. Glass once again stated that, because in his belief the killing did not make rational sense, Woo could not have "intended" to kill. He testified:

> If his intent was to shoot her, why is he looking at engagement rings, when he's intending to kill her? He knew about her infidelity long before this day. The

> infidelity didn't seem to matter until that time.
> There's no rational reason why, all of a sudden, her
> infidelity should have a killing rage attached to it,
> when before it didn't.

(Id., 81-82). Like the statements in his report, this analysis
reveals no relationship between Woo's mental defects and an
inability to formulate the specific intent to kill. Moreover, it
reflects a misunderstanding of "intent" under Pennsylvania law.
"It is well-settled that the period of premeditation necessary to
form the requisite specific intent may be very brief."
Commonwealth v. Robinson, 364 A.2d 665, 669 (Pa. 1976). Thus, the
fact that the victim's infidelity did not trigger a "killing
rage" in Woo before has no bearing on whether, at the time the
shooting occurred, Woo was capable of forming intent.

As for Dr. Hu, his report and testimony lacks any discussion
of the relationship between Woo's mental illnesses and the
purported impact those illness have on his cognitive functions.
(See PCRA Tr., 83-106, Dec. 15, 2000; PCRA Ex. B). Moreover, as
the Superior Court explained:

> [B]oth in the report and during the hearing,[Dr. Hu]
> repeatedly advances [Woo's] poor impulse control,
> explosive temper, impaired judgment, and general
> volatility as the bases or a lack of specific intent.[]
> However, as Legg, supra, makes clear, "psychiatric
> evidence that a defendant lacked the ability to control
> his actions or that he acted impulsively is irrelevant
> and inadmissible on the issue of specific intent to
> kill." Our Supreme Court has unequivocally held that
> the use of such language signals an unacceptable
> attempt to inject the notion of irresistible impulse
> into consideration. Zettelmoyer, supra.

(Woo, No. 895 WDA 2003, slip op., 5-6).

In sum, Woo has failed to direct this court to "clear and

convincing evidence" that the state courts' factual determinations regarding the lack of nexus between the doctors' diagnoses and their ultimate conclusions were wrong, 28 U.S.C. § 2254(e)(1), or unreasonable, 28 U.S.C. § 2254(d)(2). Because Woo cannot establish that there was admissible expert mental health testimony available to him to support a diminished capacity defense, he cannot demonstrate that Attorney Ceraso provided him with constitutionally ineffective assistance for failing to investigate and attempt to present that defense.

Finally, three points advanced by Woo must be addressed. First, he contends that habeas relief is mandated in this case consistent with the Court of Appeals' decision in Jacobs v. Horn, 395 F.3d 92 (3d Cir. 2005). In that case, the court held that the petitioner demonstrated that he was entitled to habeas relief because his trial counsel failed to obtain available expert psychiatric testimony to support the diminished capacity defense that he had presented at trial. Jacobs, 935 F.3d at 101-06. That case is distinguishable from the present case, however, because there was no underlying finding by the state courts that the psychiatric testimony that the petitioner claims his counsel failed to present would have been irrelevant and inadmissible at trial. Id.; Commonwealth v. Jacobs, 727 A.2d 545, 548-49 (Pa. 1999). Thus, there was not, as there is here, an underlying finding of state law admissibility that bound the federal court, nor was there an underlying factual finding that the federal court had to presume to be correct. Rather, Jacobs centered upon

23

whether counsel failed to present *relevant evidence that would have been admissible at trial*, a very different issue than that which is presented in the instant case.

Second, Woo repeatedly contends that the Commonwealth "abandoned" any argument that the defense of diminished capacity was viable because it did not address that point in its brief to the Superior Court. The Commonwealth's failure to address the issue in its brief, however, has no bearing on this court's analysis. The Superior Court did not determine that the Commonwealth waived the argument. And, under AEDPA, this court is tasked with examining the state courts' decision and deciding whether that decision satisfies the standards set forth under 28 U.S.C. § 2254(d). The state courts held that Woo did not have available to him at trial a diminished capacity defense, and that decision formed the bases of their review of his ineffective assistance claim and this court's review of that claim as well.

Third, Woo argues that state courts "blew off" Dr. Glass's and Dr. Hu's testimony and reports and that Judge McCormick usurped the function of the jury by weighing the doctor's opinions on specific intent and rejecting them. These arguments plainly have no merit. Before Woo would have been permitted to admit at trial either doctor's opinion on his ultimate conclusion and on his underlying diagnoses, each doctor's opinion would be subject to review by the trial court to first determine relevance. See Zettlemoyer, 454 A.2d at 947. Judge McCormick reviewed each doctor's report and testimony and determined that

24

it fell short of the quantum of relevance that Pennsylvania law requires before such evidence is deemed admissible at trial. He did not posit on how the jury would view the evidence; rather, he determined that the evidence would not be admissible in the first place.

### 5.   **Certificate of Appealability**

Section 102 of AEDPA, 28 U.S.C. § 2253(c), codifies standards governing the issuance of a certificate of appealability for appellate review of a district court's disposition of a habeas petition. It provides that "[a] certificate of appealability may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right." In the case at bar, Woo has not made any showing that he has been denied any of his constitutional rights. Accordingly, a certificate of appealability should be denied.

### III. **CONCLUSION**

It is recommended that, pursuant to 28 U.S.C. § 2244(b) and Rule 9 of the Rules Governing Habeas Corpus Cases Under Section 2254, that the Petition for Writ of Habeas Corpus be denied.

In accordance with the Magistrates Act, 28 U.S.C. § 636(b)(1)(B) and (C), and Rule 72.1.4(B) of the Local Rules for Magistrates, the parties are allowed ten (10) days from the date of service to file objections to this Report and Recommendation. Any party opposing the objections shall have seven (7) days from the date of service of objections to respond thereto. Failure to

file timely objections may constitute a waiver of any appellate

rights.


                                        s/Francis X. Caiazza
                                        Francis X. Caiazza
                                        United States Magistrate Judge

Dated: October 25, 2006.


cc:
The Honorable Arthur J. Schwab

All Parties of Record